UNITED STATES of America, Appellee,

v.

Herminio CRUZ, Defendant, Appellant.

No. 78–1146.

United States Court of Appeals,
First Circuit.

Argued Dec. 6, 1978.
Decided March 9, 1979.

Allan A. Ackerman, Chicago, Ill., with whom Ackerman, Durkin & Egan, Chicago, Ill., was on brief, for defendant, appellant.

Walter B. Prince, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Har-rington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

The procedural aspects of this case are a little out of the ordinary. Defendant-appellant, Herminio Cruz, appeals his conviction by the district court sitting without a jury of conspiracy to possess with intent to distribute and distribution of heroin in violation of 21 U.S.C. § 841(a)(1) and § 846. Appellant was indicted, along with eight codefendants, on a one count conspiracy charge. All eight codefendants pleaded guilty prior to trial. Appellant had been convicted on December 30, 1977, and sentenced to a term of fifteen years after a jury trial in the Northern District of Illinois of possession of heroin with intent to distribute based on the same facts that were the basis of the conspiracy indictment. We held, on an interlocutory appeal, that the double jeopardy proscription of the Constitution did not bar the conspiracy prosecution in the District Court of Massachusetts. *United States v. Cruz*, 568 F.2d 781 (1st Cir. 1978). After receiving what amounted to a promise that any sentence would be concurrent to that imposed in the Northern District of Illinois appellant agreed to submit his case to the court on stipulated facts consisting mainly of the record of the Chicago trial. Appellant was found guilty and sentenced to a term of fifteen years imprisonment to be served concurrently with the sentence already imposed in the Northern District of Illinois and a three year special parole term.[1]

Four issues are raised on appeal:[2]

1. the validity of the search warrant that opened appellant's premises;

2. appellant's right to attack the sufficiency of a wiretap affidavit and order;

3. whether the district court went outside of the record in determining guilt; and

---

1. We note without comment that the Chicago conviction has been appealed, raising the possibility of reversal.

2. Appellant again raises the double jeopardy issue, but we see no point in reconsidering and restating our opinion of January 6, 1978.

4. whether the evidence proved appellant guilty beyond a reasonable doubt.

## THE WARRANT

### The Affidavit Statements

The case had its genesis in an investigation starting in 1976 by the Hartford office of the Drug Enforcement Administration (DEA). The investigation focused on one Rafael Kercado-Rivera of Springfield, Massachusetts. A court-authorized wiretap of Kercado-Rivera's telephone was installed, resulting in the intercept of two telephone conversations relative to bringing heroin from Chicago to Western Massachusetts. On December 15, 1976, Kercado-Rivera was called by Jose DeLeon of Chicago, an indicted coconspirator, and told that six kilos of heroin were available in Chicago at the price of $28,000 per kilo. Kercado-Rivera agreed to purchase one kilo. That same evening one Daisy Gonzales, known to be an acquaintance of Kercado-Rivera, made airline reservations to go to Chicago the next day. Neither appellant's name nor address was mentioned during either of the telephone calls intercepted.

After Hartford DEA agents had observed Gonzales board a flight to Chicago, this information, along with a physical description of Gonzales and Kercado-Rivera, was sent to DEA agents in Chicago. Gonzales was followed by DEA agents after she left O'Hare International Airport to a restaurant in Chicago where she met an individual who fit the description and was, in fact, Kercado-Rivera. A short time later, the two left the restaurant and drove to 3651 Belden Street, Chicago.

These facts, which are recited in paragraphs 1 through 7 of the affidavit underpinning the search warrant, are not challenged. Appellant's challenge to the validity of the warrant focuses on what was stated in the affidavit as to who left the Belden Street address after Kercado-Rivera and Gonzales had arrived there, and what that individual subsequently did. Paragraphs 8, 9, and 10 contain the following information. Kercado-Rivera left the Belden Street address carrying a brown paper bag and drove to 2514 West Hadden Street, which he entered with the bag. A short time later, he left the West Hadden Street residence with a white paper bag and drove back to the Belden Street address. Gonzales, Kercado-Rivera, and an unknown male left Belden Street together in an automobile which proceeded to the intersection of Leavitt and Milwaukee Streets, where Gonzales and Kercado-Rivera left the automobile and took a taxi to O'Hare Airport.

Paragraphs 11 and 12, which are undisputed, state that both Gonzales and Kercado-Rivera took a flight to Hartford, that Gonzales was arrested on her arrival in Hartford and that the heroin she was carrying was seized, along with a white paper bag which bore a Chicago address.

On the basis of this information, a warrant was issued for the search of the residence at 2514 West Hadden Street, Chicago, the home of appellant. Five kilos of heroin were found in the basement of appellant's home. Drug related paraphernalia and $29,000 in cash inside a torn brown paper bag with Massachusetts bank wrappers were found after a search of the first floor.

Appellant attacks the search warrant on the basis of the incorrect statements in paragraphs 8 and 9 of the affidavit, that it was Kercado-Rivera who went from the Belden Street address to the West Hadden Street house and then returned to Belden Street. Based on the statements made by the DEA agents at the suppression hearing, it is clear that the person who visited West Hadden Street was Jose DeLeon and that the unknown male in the car that drove to the intersection of Leavitt and Milwaukee Avenues was also DeLeon. The identification of DeLeon by the DEA agents as the West Hadden Street visitor was made subsequent to the execution of the affidavit after the agents had an opportunity to examine photographs taken during the surveillance.

After a series of lengthy suppression hearings, the district court, in a written memorandum and order, found that the error in identification of the courier between

Belden Street and West Hadden was "an honest mistake which was neither knowing, reckless, nor negligent." The court also found "that the identity of the courier was not a material fact in the establishment of probable cause."

*The Law*

Appellant's contention is deceptively simple. He argues that, since paragraphs 8 and 9 of the affidavit were factually incorrect, they must be eliminated and, if that is done, no probable cause existed for granting the search warrant for West Hadden Street and the warrant, therefore, falls.

The legal precedent applicable and followed when this case was before the district court was this court's opinion in *United States v. Belculfine*, 508 F.2d 58, 63 (1st Cir. 1974). In *Belculfine*, we held that evidence should be suppressed if it had been obtained in reliance on an intentional and material misstatement in an affidavit, but we did not consider whether suppression would be required if the statements were made recklessly. Since then, the Supreme Court has addressed the issue and has determined both the circumstances under which a defendant may challenge the veracity of an affidavit supporting a warrant and the consequences that follow if such a challenge is successful.

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if

probable cause was lacking on the face of the affidavit.

*Franks v. State of Delaware*, 438 U.S. 154, 156, 157, 98 S.Ct. 2674, 2676, 2677, 57 L.Ed.2d 667 (1978). The Supreme Court's decision in *Franks* made it clear that the reach of *Belculfine* must extend to statements made recklessly, but did not in other respects affect our prior holding. As the district court held a hearing and found that the statements in issue here were not made recklessly, this case can be analyzed appropriately under *Franks*. We need not consider whether that decision was retroactive, as it does not affect *Belculfine* in any way relevant here.

■ Initially, we note that, if the affidavit could be taken at face value, the information used to procure the warrant would clearly meet the *Aguilar-Spinelli* requirements. *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). In *Aguilar*, the Court held:

> Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, *see Rugendorf v. United States*, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887, was "credible" or his information "reliable."

*Id.* at 114, 84 S.Ct. at 1514. Here, although the affidavit stated that the initial tip came from a confidential informant of the Hartford DEA office, it, in fact, came from a legally authorized wiretap intercept of telephone conversations on Kercado-Rivera's phone. And the magistrate was so informed. The affidavit is precise as to times, places, and who was observed doing what. This clearly met the requirement

that the magistrate be informed of some of the underlying circumstances so that he could determine whether the informant was "credible" or his information "reliable." Based on the information contained in the affidavit, there can be little doubt that probable cause was established for a search of the West Hadden Street residence.

■ We now proceed to analyze the affidavit in the light of *Franks*. Although appellant's brief is liberally laced with the conclusory terms, "perjury" and "false statements" and urges that the identity statements in paragraphs 8 and 9 of the affidavit were material, we are bound by the findings of the district court unless they were clearly erroneous.

At the lengthy suppression hearing, which was held on three different dates testimony to the following effect was given. At the time the affidavit was drafted, the affiant and surveillance agents believed that the person who went from the Belden Street premises to the West Hadden Street residence with a brown paper bag and returned to Belden Street with a white paper bag was, as the affidavit states, Kercado-Rivera. The description which the Chicago agents received from Hartford of Kercado-Rivera was that he was a Caucasian male of Puerto Rican extraction, height of between 5'6" and 5'8", weight about 170 pounds, short black hair and approximately 33 years old. DeLeon is also a Caucasian Puerto Rican male of similar height, although lighter in weight. Both men, according to the surveillance agents, wore dark slacks and leather jackets on the day in question. The agents observed a Puerto Rican male wearing a brown leather jacket leave the Belden Street address with a brown paper bag. A few minutes prior to this, an individual of the same general description had entered the building with Gonzales. The agents testified at the suppression hearing that it was not until after surveillance photographs were developed on December 28, 1976, that they realized that the West Hadden Street visitor was someone other than Kercado-Rivera. It was not until January of 1977 that the brown and white bag carrier was identified as Jose DeLeon.

The question under *Franks* is: Was the district court clearly erroneous in finding that appellant did not establish by a preponderance of the evidence that the affidavit misstatements were perjury or made with a reckless disregard of the truth *and*, if set aside, would render the balance of the affidavit insufficient to establish probable cause for the warrant?

We point out first that there is no dispute that Gonzales and Kercado-Rivera met in a restaurant and proceeded to the Belden Street address. Nor is there any question that a male left Belden Street with a brown bag, went to the West Hadden Street residence and returned to Belden with a white paper bag. There is and can be no challenge to the affidavit statement that Kercado-Rivera, Gonzales, and "an unknown male" left Belden Street together and drove to a point where Gonzales and Kercado-Rivera left the car and took a taxi to the airport. It is undisputed, as stated in the affidavit, that Kercado-Rivera and Gonzales then took the plane to Hartford where Gonzales was arrested in possession of approximately one kilo of heroin and a white paper bag with a Chicago address on it.

Given these undisputed facts, the incorrect identification of Kercado-Rivera as the one who went to West Hadden Street was not material. The key fact was that someone closely involved with Gonzales and Kercado-Rivera picked up a quantity of heroin at appellant's residence on West Hadden Street and delivered it to Gonzales. If the affiant had used the phrase "unknown male" instead of Kercado-Rivera, probable cause would still have existed for issuing the search warrant for Cruz's residence. The incorrect information was not necessary to a finding of probable cause.

While our finding that the misstatements in issue were not material is sufficient to dispose of this appeal, we note our agreement with the district court's finding, that the misstatements were made neither knowingly nor recklessly. This was a case of understandable mistaken identity, not the type of intentional misstatement cover-

ed in *United States v. Belculfine, supra,* 508 F.2d 58. As we said in *United States v. Cruz Pagan,* 537 F.2d 554, 557 (1st Cir. 1976): "We are convinced that the likelihood of the alleged discrepancies having any effect on the determination of probable cause was negligible, and that the policies underlying *Belculfine* simply are not called into play here." Nor is this the same kind of situation as in *United States v. Astroff,* 556 F.2d 1369 (5th Cir. 1977), where the affidavit contained a statement that would reasonably lead the magistrate to believe that suitcases had been opened and marijuana seen in them, when, in fact, the suitcases had not been opened and their contents observed. Nor do we have here a series of misrepresentations whose cumulative effect made it impossible for a neutral magistrate to exercise independent judgment. *United States v. Esparza,* 546 F.2d 841 (9th Cir. 1976).

We find that the district court's application of the *Belculfine* test was clearly correct and that, under the holding of *Franks,* the warrant was validly issued.

### THE WIRETAP

█ Appellant's argument on this issue can be stated as follows: since the starting point for the issuance of the warrant came from information received as a result of a court-authorized wiretap, appellant has a right to disclosure of the information and supporting documentation used to obtain the order so that, if justified, he can attack the validity of the wiretap.

The district court found and we agree that appellant had no standing to obtain such information because he was not an "aggrieved person" within the meaning of the statute. 18 U.S.C. § 2510(11).[3] In *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), the Supreme Court analyzed in depth the impact of the fourth amendment on electronic surveillance, passed on the question of standing, and held:

In these cases, therefore, any petitioner would be entitled to the suppression of government evidence originating in electronic surveillance violative of his own Fourth Amendment right to be free of unreasonable searches and seizures. Such violation would occur if the United States unlawfully overheard conversations of a petitioner himself or conversations occurring on his premises, whether or not he was present or participated in those conversations.

*Id.* at 176, 89 S.Ct. at 968. We have also addressed the question of who is an "aggrieved person" under the statute. In *United States v. Plotkin,* 550 F.2d 693, 695 (1st Cir.), *cert. denied sub nom. Considine v. United States,* 434 U.S. 820, 98 S.Ct. 61, 54 L.Ed.2d 76 (1977), after an extensive review of the pertinent authority, we held:

At the outset we note that all of the appellants are challenging the admission of the evidence on the ground that it is the fruit of an illegal wiretap which intercepted conversations of appellant Serino. None of the other appellants were allegedly overheard during any other illegal wiretap. Only appellant Serino therefore has standing to assert a violation of his Fourth Amendment rights in seeking to suppress the evidence.

Our position is not unique. *See, e. g., United States v. Wright,* 524 F.2d 1100 (2d Cir. 1975); *United States v. Scasino,* 513 F.2d 47 (5th Cir. 1975).

█ Appellant urges, however, that, even if he is not an "aggrieved person" under the statute, he should have standing to explore the background of the order authorizing the wiretaps under the fourth amendment because it was his house which was searched. This is a beguiling argument, but, on scrutiny, withers to a frail reed. While the intercepts did instigate the surveillance, they in no way, directly or indirectly, pointed to appellant or his residence as the source of the heroin to be sold. Neither Cruz's name nor address came into the phone conversations at all. It was the surveillance of

---

3. "'Aggrieved person' means a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed."

Gonzales, Kercado-Rivera, and the person who later turned out to be DeLeon which led the agents to appellant's residence as the probable drug supply source. The fourth amendment has two applications in this case: one to the electronic surveillance, and the other to the search warrant. Each is distinct and separate. Appellant was well within his rights in challenging the affidavit basis of the warrant which authorized the search of his home, but he has no standing to examine the authorization material for the wiretap since neither his phone nor his conversations was implicated. Our analysis of who is entitled to post interception notice of wiretap conversations applies here.

With a conventional search, it has never been suggested that, when a letter in the possession of the primary target of the search contains communications from a third party, the third party is constitutionally entitled to notice and an inventory.

*United States v. Harrigan*, 557 F.2d 879, 884 (1st Cir. 1977). Here, we do not even have communications from the third party; all we have is information that resulted in surveillance of those whose conversations were heard which, in turn, led to appellant's home. The fourth amendment's protection against search by electronic surveillance does not extend to one whose conversations were not involved in the wiretap.[4]

## WHETHER THE DISTRICT COURT WENT OUTSIDE THE RECORD

■ During a lengthy discussion as to what counsel had agreed on as a stipulation to the bench trial, the court stated:

THE COURT: Well, why not do this, since I think you can save yourselves a great deal of time—why don't I call a recess at this time, and you sit down with your client and the Government attorneys and go over this stipulation as such and determine what it is that is in it that hurts you as far as this case is concerned, and you still have your appeal rights obviously, and then if you can not agree to the signing. of it, it seems to me that the Government at that point would have the opportunity to come forward and offer evidence as to what they feel is necessary to go forward with the conspiracy elements. Then it seems to me that you also would have the right to offer a defense, if you feel you want to, at that point, and I would not have to make a decision as to whether or not it is sufficient.

The end result we are all talking about, that is as to a concurrent sentence, I would indicate to you now, and it is probably incorrect for me to say so, but I do offer to you now that I doubt every much if I would ever give you on and after sentence in this case where you have evidence as to two crimes from the same set of facts. You can rest assured that there probably would be no penalty attached to this whatever you do.

MR. ACKERMAN: That is a consideration.

THE COURT: But by the same token once again as the trial judge and the judge who heard an awful lot of evidence in this case from the motions to suppress, from the various plea bargains that did occur, and from the individual pleas that developed during the trial, and I don't know if you know this but they all did eventually plead—

MR. ACKERMAN: I understand.

THE COURT: They have all since been sentenced. *I heard all the elements, all*

---

4. Even if the authorization for the wiretap were found to be defective, we doubt that it would protect defendant here. "Despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons. As with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served.

The balancing process implicit in this approach is expressed in the contours of the standing requirement. Thus, standing to invoke the exclusionary rule has been confined to situations where the Government seeks to use such evidence to incriminate the victim of the unlawful search." *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974).

*the facts that would be necessary. I heard it repeatedly. I think I could be a pretty good witness, rather than a judge, at this point to talk about the evidence.* But anyway, from all this just determine in your own mind whether you can stipulate. Then I would hear arguments on your motion for acquittal, and from the Government as to whether they feel there is enough evidence to sustain a conviction. Then I would have to make a determination (emphasis added).

Appellant has seized upon the underscored sentences as showing that in deciding the case the trial court went outside the record. This, we think, is a distortion of what was said and what was intended. The judge, in trying to be fair, pointed out that before accepting the pleas from the eight codefendants the basic facts had to be outlined to him for each pleading defendant. Appellant has not pointed to anything in the court's opinion that suggests or implies that the court considered anything other than the material submitted. Moreover, appellant's counsel agreed to the bench trial *after* the court's remarks.[5]

Appellant also suggests that the court's reference to the Chicago conviction indicates that it was unduly influenced by it. This reference came during a colloquy with the prosecutor when the United States Attorney was urging the court to find appellant guilty of conspiracy. The court stated:

THE COURT: Aside from the fact that he was in possession of the heroin in question, and for that he has been convicted, and that is a crime standing by itself, where is the agreement you can

find that this Court can sustain beyond a reasonable doubt that DeLeon or anyone else entered into an illicit transaction?

Obviously, the court was excluding appellant's Chicago conviction from consideration, not using it as evidence. Appellant's reliance on *United States v. Hamrick*, 293 F.2d 468 (4th Cir. 1961), is inapt. In that case, the trial court was reversed for examining the defendant's criminal record which was not in evidence during the trial and before verdict. Here, appellant, himself, had expressly stipulated that the record of the trial in which he had been convicted was to be submitted to the court as evidence. To complain now that the judge was prejudiced because he knew of appellant's conviction for possession of heroin is carrying advocacy beyond the bounds of reason and fairness.

### THE EVIDENCE

Our review of the evidence convinces us that it was sufficient for a finding of guilt. We state frankly that, even viewing the evidence from a neutral vantage point rather than in the light most favorable to the government, it is still clear and convincing beyond a reasonable doubt. As appellant recognized from the outset, the key to the case was the search warrant. Once the door to appellant's house was legally opened for a search, his participation in the conspiracy was exposed.

*Affirmed.*

**5.** The two cases cited by appellant are inapposite. In *United States v. Vaughan*, 443 F.2d 92 (2d Cir. 1971), the trial court's determination of guilt was reversed because it continuously referred to a letter written to the court by the defendant prior to trial and not introduced in evidence. *United States v. Lookretis*, 398 F.2d 64 (7th Cir. 1968), is a little more complicated but clearly distinguishable as well. The order of the circuit court, *United States v. Lookretis*, 385 F.2d 487 (7th Cir. 1967), *vacated*, 390 U.S. 338, 88 S.Ct. 1097, 19 L.Ed.2d 1219 (1968), was vacated by the United States Supreme Court

following its decisions in *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), and *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968). The case had been tried in the district court on a stipulation of facts prior to *Marchetti*. On remand, the government urged that the harmless error rule should apply to the district court's opinion. The court ruled otherwise. It felt that the trial judge, being without the benefit of *Marchetti*, might have relied on evidence that *Marchetti* had subsequently held unconstitutional and inadmissible.